***********
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford, and the briefs and oral argument before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of Deputy Commissioner Ledford and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the parties.
3. Kvaerner Construction, Inc. was self-insured with Gallagher Bassett Services, Inc. serving as its third party administrator.
4. Plaintiff's average weekly wage was $520.00, yielding a compensation rate of $346.67.
5. Plaintiff received temporary total disability benefits at the rate of $346.67 per week, beginning August 26, 1997.
6. All persons are properly before the Commission and the Commission has proper jurisdiction for this action.
7. Attached to the Pre-trial Agreement were additional documents, including plaintiff's medical records, which were received as evidence.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was forty-two years of age at the time of the Deputy Commissioner's Opinion and Award and was born on November 24, 1962. Plaintiff has a G.E.D. and completed one year of technical college.
2. Plaintiff worked for defendant as a construction worker. On May 15, 1997, plaintiff was working on sheetrock installation and sustained an injury to her head when she jumped into a windowsill to enter a bathroom. At the time, she was not wearing a hardhat. Plaintiff's head struck a wooden stub protruding from the wall and she sustained a laceration to her scalp. Plaintiff fell back, hit the tile floor with the back of her head, and may have lost consciousness for a few seconds.
3. Plaintiff was seen that day at Wake Medical Center. Plaintiff reported that she struck her head on a sharp edge of wood, but there is no notation that plaintiff mentioned striking her head on the floor. Plaintiff was assessed with a three centimeter laceration to the right parietal scalp. The wound was cleaned and four sutures applied, and plaintiff was released to follow-up with her own physician, Dr. Lori Lilley at Carolina Surgical Associates.
4. On July 17, 1997, plaintiff returned to Wake Medical Center complaining of blurred vision and headaches, which she reported had gotten worse and were aggravated by bright light. Plaintiff was assessed with post-traumatic headaches and given prescription medication. A head CT scan was ordered, which was normal.
5. On July 21, 1997, plaintiff saw Dr. Lilley for complaints of headaches and nausea brought on by bright lights and noise, with blurred vision at times. Dr. Lilley noted a normal neurological exam and normal CT scan results. Dr. Lilley assessed headaches after trauma and referred plaintiff to neurologist Dr. Laura Jozewicz for further evaluation.
6. Dr. Jozewicz examined plaintiff on July 24, 1997. Plaintiff reported to Dr. Jozewicz that after hitting her head, she fell to the floor and "dazed out for a second." Dr. Jozewicz noted plaintiff had a normal neurological exam and assessed plaintiff with persistent migraine or vascular headaches, post-head injury, and prescribed medication. She released plaintiff for part-time work two to three days per week at five hours per day, as tolerated.
7. On August 12, 1997, Dr. Jozewicz noted that plaintiff's headaches had "improved approximately 40%." Although Dr. Jozewicz released plaintiff to part-time work, she also noted to Dr. Lilley in a letter dated August 7, 1997 that plaintiff's job had apparently been terminated and that plaintiff was in the process of trying to find another job.
8. On September 8, 1997, Dr. Jozewicz found that plaintiff's headaches had improved. Dr. Jozewicz also noted plaintiff was experiencing depression and that she was not working. On November 6, 1997, Dr. Jozewicz again noted improvement in plaintiff's headaches, but that the headaches still occurred with stress. Dr. Jozewicz determined that plaintiff had reached maximum medical improvement and released her to return to work with no restrictions. In her deposition, Dr. Jozewicz testified to a reasonable degree of medical certainty that plaintiff's headaches were caused by her injury by accident at work on May 15, 1997. Dr. Jozewicz also noted that plaintiff would benefit from vocational rehabilitation to assist her in a new job placement. Plaintiff did not return to see Dr. Jozewicz until August 6, 1998, following an intervening injury.
9. On February 3, 1998, plaintiff was involved in a non-work related altercation, resulting in injury to her head. Plaintiff was a patron at the "Pure Gold" strip club with her boyfriend, who has since become plaintiff's husband. An altercation occurred and plaintiff allegedly sustained multiple blows to her head. Plaintiff testified that her head was repeatedly bashed against the cement, although she denied any bleeding. Plaintiff alleges that as a result of the altercation she "blacked out" and also injured her shoulder. The February 3, 1998 altercation was not a result of plaintiff's own intentional conduct.
10. On March 4, 1998, about a month after the altercation, plaintiff sought treatment from Dr. Kapil Rawal, a neurologist. Plaintiff complained of severe headaches, double vision, problems focusing, and ringing in both ears. She reported both her work injury and that she blacked out three or four times during the altercation on February 3, 1998. Dr. Rawal assessed plaintiff with post-traumatic muscle contraction headaches with vascular component. Dr. Rawal ordered an MRI of the brain, which was performed on March 13, 1998, and was negative. He also ordered an EEG, done on March 18, 1998, which was normal. Plaintiff continued to receive follow-up treatment from Dr. Rawal, but did not seek treatment from him between October 1998 and August 1999. Dr. Rawal's objective examinations and tests showed no neurological basis for plaintiff's complaints.
11. On September 8, 1998, plaintiff began treatment with Dr. Peter Smith, a clinical psychologist. Plaintiff's treatment with Dr. Smith involved components other than the injury that is the subject of this claim, including domestic issues. In his deposition, Dr. Smith testified that plaintiff's work injury in May 1997 substantially caused her current psychiatric problems and that it is not possible to separate the treatment for the work-related injury from other traumas in plaintiff's life, such as the February 1998 altercation and other domestic issues. In Dr. Smith's opinion, plaintiff is not able to return to competitive employment eight hours per day, 40 hours per week and maintain the attendance, production, and interaction required by most employers.
12. On July 29, 1999, at the request of defendant, plaintiff was evaluated by Dr. Verne Schmickley, a psychologist. Dr. Schmickley conducted an initial evaluation, during which plaintiff became irritated and frustrated and the session was discontinued. Dr. Schmickley reviewed other medical records and formed some impressions. He noted signs of malingering and felt plaintiff's current psychological problems were not causally related to her work-related injury.
13. As of April 25, 2000, Dr. Rawal felt plaintiff had reached maximum medical improvement from a neurological standpoint. At that visit, Dr. Rawal advised plaintiff that she could return to work without restrictions. He explained to plaintiff that her post-traumatic headaches might continue for a long time, but that they usually resolve six to eight months post-injury. Dr. Rawal prescribed massage therapy once per week for eight weeks. He also noted several other symptoms that indicated psychological overlay and stress, and recommended plaintiff receive psychological treatment. Plaintiff became upset and left Dr. Rawal's office.
14. Plaintiff did not return to see Dr. Rawal until September 2000. She continued her prior complaints of headaches and made additional complaints. Upon examination, Dr. Rawal found no change in plaintiff's neurological status and determined that no further studies were needed. Dr. Rawal again advised plaintiff that there was no neurological basis for work restrictions. Plaintiff again became upset, left Dr. Rawal's office and did not return. In his deposition, Dr. Rawal testified that plaintiff's May 1997 injury could cause her chronic headaches. Dr. Rawal also testified, however, that because plaintiff's headaches were ongoing into 2001, it was more likely her symptoms were psychosomatic and that conversion might be controlling her symptomatology. Dr. Rawal also testified that it was not possible to separate the May 1997 injury at work from any injury from the February 1998 altercation.
15. Plaintiff's counsel referred her to Dr. Robert Conder, a neuropsychologist, for an evaluation. Dr. Conder first examined plaintiff on March 10, 1998 and noted both plaintiff's and Dr. Jozewicz's description of the May 15, 1997 accident at work. Dr. Conder recorded that on May 15, 1997, plaintiff was at work when she leapt up aggressively and struck the right temporal-parietal area of her skull on a "stob." Plaintiff then struck the back of her head on the floor and was not sure if she actually lost consciousness or "fogged out." Dr. Conder's history briefly mentions the altercation in February 1998, noting that she was assaulted, beaten about the head, and may have received a concussion and possible skull fracture. Plaintiff reported that the February 1998 altercation exacerbated her headaches and that she was being treated by Dr. Rawal and other physicians for the altercation.
16. On October 24, 2000, plaintiff was re-evaluated by Dr. Conder. Dr. Conder assessed plaintiff with concussion, depression, and a pain disorder with conversion features. Dr. Conder found that while it was difficult to differentiate between the May 1997 work injury and the February 1998 assault, "[t]he 1998 assault clearly exacerbated Mrs. Post's headache situation." In his deposition, Dr. Conder testified that plaintiff's May 1997 injury was a cause of her neuropsychological and headache symptoms and that the February 1998 injury more likely than not aggravated plaintiff's symptoms. Dr. Conder also indicated that he felt plaintiff was at maximum medical improvement from a neuropsychological perspective, and that she could not return to her previous employment in heavy construction. Dr. Conder stated that he would expect that any future work would require some modifications, such as lighting for photosensitivity, low stress environments, and flexible attendance requirements due to headaches. Dr. Conder acknowledged that he evaluated plaintiff using the Minnesota Multiphasic Personality Inventory (MMPI), a test that has been replaced by the MMPI-2, but denied that the MMPI was outdated or that the test results were not valid.
17. While under the care of Dr. Rawal and on the referral of her counsel, plaintiff presented to Dr. Gregory Bertics, a neurologist, on May 7 and 19, and August 18, 1998. Dr. Bertics noted plaintiff was "knocked out" by the May 1997 work injury and that her headaches following the injury grew over time from mild to severe. Dr. Bertics assessed plaintiff with post-concussive syndrome, with complaints of short-term memory loss, headaches, and loss of concentration. He felt that despite testing, it would be very difficult to determine which of plaintiff's problems were caused by the May 1997 injury and which were caused by the February 1998 injury. Dr. Bertics also testified that more likely than not, plaintiff's fall in May 1997 was the cause of her headaches and that it was a clinically significant factor in plaintiff's headache symptoms in 2001. During his deposition, Dr. Bertics stated that from a neurological perspective, plaintiff was not disabled and that her root problems were psychological in nature. Dr. Bertics would not render an opinion on plaintiff's psychological status and deferred to the opinions of Dr. Smith and Dr. Conder regarding plaintiff's psychological and neuropsychological status.
18. John McGregor, vocational rehabilitation counselor, testified that based upon plaintiff's educational background, her experience, transferable skills and medical status, he was of the opinion that suitable employment was available for plaintiff. Mr. McGregor acknowledged that this was dependent upon plaintiff being released to return to work by her physicians.
19. The Full Commission gives greater weight to the testimony of Dr. Jozewicz, Dr. Rawal, Dr. Conder, Dr. Bertics and Dr. Smith, plaintiff's treating physicians, than the opinions of Dr. Schmickley. Plaintiff's treating physicians assessed her as suffering from post-traumatic headaches and were unable to differentiate between the original injury of May 15, 1997 and the subsequent altercation of February 3, 1998.
20. Defendant accepted this as a compensable injury and paid plaintiff's medical expenses but did not file a Form 60 until August 26, 1998, over a year after the injury by accident. Defendant paid plaintiff ongoing benefits since August 26, 1997.
21. From August 26, 1997 until April 25, 2000 when she was released to return to work by Dr. Rawal, plaintiff was disabled from any employment. After April 25, 2000, plaintiff was capable of some work but failed to make a reasonable effort to find employment.
22. Defendant defended this claim upon reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On May 15, 1997, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer, when her head struck a wooden stub protruding from a wall and she sustained injuries to her head. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's compensable injury by accident on May 15, 1997 was aggravated by the non-work related altercation on February 3, 1998, which was not attributable to plaintiff's own intentional conduct, and thus, the subsequent aggravation of plaintiff's primary injury is also compensable. Horne v. Universal LeafTobacco Processors, 119 N.C. App. 682, 459 S.E.2d 717
(1995).
3. Defendants admitted the compensability of plaintiff's injury by accident by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v.Charmes/Arby's Roast Beef, 142 N.C. App. 154,542 S.E.2d 277 (2001).
4. In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages.Demery v. Perdue Farms, Inc., 143 N.C. App. 259,545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc.,supra.
6. In the instant case, plaintiff met her initial burden to show that she is disabled. On April 25, 2000, however, plaintiff reached maximum medical improvement from the injuries sustained in the injury by accident and she was released to return to work. Plaintiff did not meet her burden to prove that after August 25, 2000, she was unable to obtain employment after a reasonable effort or that it was futile for her to seek employment because of other factors. Plaintiff was capable of some work and no doctor took her completely out of work. N.C. Gen. Stat. § 97-29; Russell v. LowesProduct Distribution, supra. Thus, as a result of the compensable injury by accident, plaintiff is entitled to temporary total disability compensation at a rate of $346.67 per week beginning August 26, 1997 and ending April 25, 2000. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to payment by defendant of all reasonably necessary medical expenses incurred by plaintiff for treatment of her injuries, so long as said treatment effects a cure, gives relief, or tends to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25. Dr. Bertics is designated as plaintiff's authorized treating physician for the coordination, direction and management of her medical treatment.
8. Defendant's defense of this claim was reasonable and not stubborn, unfounded litigiousness, and therefore, plaintiff is not entitled to an award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.Sparks v. Mountain Breeze Restaurant and Fish House,Inc., 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Subject to a reasonable attorney's fee below, defendant shall pay plaintiff temporary total disability compensation at a rate of $346.67 per week beginning August 26, 1997 and ending April 25, 2000.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or tend to lessen plaintiff's period of disability.
3. A reasonable attorney's fee of 25% of the compensation awarded plaintiff in paragraph 1 of this Award is hereby approved for plaintiff's counsel and shall be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendant shall pay the costs, including all expert witness fees previously approved.
This 14th day of October, 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER